## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MAINE

```
************************************
In re:                             )      Chapter 7
        T & R Flagg Logging, Inc., )      Case No. 07-20858
             Debtor                )
************************************
        Northeast Bank,            )
             Plaintiff             )      Adv. Proceeding No. 07-2104
                                   )
                v.                 )
                                   )
Caterpillar Financial Services Corp., )
             Defendant             )
************************************
```

### Memorandum of Decision

#### I.  Introduction

Before me is a lien priority dispute between Northeast Bank ("Northeast") and Caterpillar Financial Services Corp. ("Caterpillar").  Each asserts a senior position in four pieces of logging equipment purchased by T & R Flagg Logging, Inc., ("Flagg") from Southworth-Milton, Inc., before Flagg filed for bankruptcy relief.  As explained below, I find and conclude that Northeast's blanket security interest in all Flagg's assets trumps Caterpillar's lien because, although it claims to do so, Caterpillar does not hold a perfected purchase money security interest (pmsi) in the equipment.

#### II.  Procedural History

Flagg filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code[1] in the fall of 2007.  In early 2008, Flagg's case was converted to Chapter 7.  Caterpillar has been

---

[1]      "Bankruptcy Code" or "Code" refers to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. § 101, et seq.

granted relief from stay with regard to the equipment encumbered by its and Northeast's

competing liens, but the two lienors reserved the right to joust over their respective priorities.

The issues were proffered via cross-motions for summary judgment.  However, at oral

argument, counsel conceded that the outcome pivots not so much on *what happened when* (about

which there is no real dispute) as it does upon the *legal significance of events*.  Accordingly, they

stipulated that the matter would be submitted for decision on the record.  Thus, I proceed to

decision under the auspices of Fed. R. Bankr. P. 7052, rather than Fed. R. Bankr. P. 7056.[2]  This

memorandum sets forth my findings of fact and conclusions of law pursuant to Rule 7052's

paradigm.[3]

### III.  Factual History

Flagg borrowed approximately $740,000 and entered into a $50,000 line of credit

arrangement with Northeast late in 2006.  Flagg secured its repayment obligations with

mortgages of real property and a blanket security interest in all its personal assets, extending to

after-acquired personalty, as well.  Northeast's security interest is valid and perfected.

In February 2007, Flagg applied to Caterpillar for financing to enable it to purchase

equipment from Southworth-Milton.  Caterpillar declined Flagg's application, indicating it

needed additional information, and compliance with certain terms (e.g., cross-default and cross-

---

[2]      "[T]o stipulate a record for decision allows the judge to decide any significant
issues of material fact that he discovers; to file cross-motions for summary judgment does *not*
allow him to do so."  Boston Five Cents Sav. Bank v. Sec'y of Dept. Of Hous. And Urban Dev.,
768 F.2d 5, 11-12 (1st Cir. 1985)(emphasis in original).

[3]      I have jurisdiction over this dispute between non-debtor parties, as it is "related
to" Flagg's bankruptcy case.  See 28 U.S.C. § 1334(b).  See also 28 U.S.C. § 157(b)(2)(A), (B)
and (K).  The parties have agreed that I may enter final judgment.  Pre-Trial Scheduling Order
dated February 5, 2008, docket entry no. 6.

collateralization covenants) before it would consider the application further.

On March 23, 2007, Flagg's principal completed a Southworth-Milton purchase order for four pieces of equipment with a total proposed purchase price of $553,000, plus tax and other costs. The purchase order contemplated Flagg's trade-in of three pieces of its own equipment and a $44,017.17 down payment. The purchase order indicated that the parties anticipated financing through Caterpillar, but final sale was not conditioned on that financing.

Notwithstanding the fact that Flagg's execution of the purchase order did not, in either party's view, create a contract, Southworth-Milton delivered the four pieces of to-be-purchased equipment to Flagg over the period March 12, 2007, through April 11, 2007. As to one item, Flagg signed a receipt, indicating the equipment was taken as a "demo."[4] About the same time, Southworth-Milton took possession of the three machines Flagg had indicated it would trade in as part of the transaction they anticipated consummating.

On March 27, 2007, Flagg again applied to Caterpillar for financing and, again, was declined. Discussions endured. On May 10, 2007, Flagg forwarded to Caterpillar disbursement instructions (including pay-off amounts for liens encumbering the trade-in machines) for such funds as may be advanced should Caterpillar extend the requested credit.

From the time the machines were delivered to Flagg until June 11, 2007, Southworth-Milton was the sole owner of the equipment Flagg intended to purchase; no sale had taken place. But on June 11, 2007, Southworth-Milton issued its Sales/Rental Invoice to Flagg in the amount of $312,900 (representing the purchase price, less trade-in credit, but not including amounts

---

[4]    The parties agree that the "demo" notation indicated their agreement that Flagg was taking the machine "on trial," so it could be considered for purchase.

required to pay off liens on the trade-in machines), with a term requiring "net cash on receipt of invoice." This invoice contained boilerplate by which Southworth-Milton purported to retain title to the sold equipment pending full payment of the purchase price. At the same time, Southworth-Milton removed the purchased equipment from its inventory, added the trade-in equipment to its inventory, and booked a $312,900 receivable owed by Flagg. As of June 11, 2007, Caterpillar had not committed, even conditionally, to the financing Flagg sought.

Southworth-Milton re-sold one of Flagg's traded-in machines on June 17, 2007. The record does not reflect how Southworth-Milton applied the sale proceeds.

Eventually, negotiations between Caterpillar and Flagg got on track, and they agreed on terms for financing.[5] Twice, on July 11 and again on July 23, 2007, Caterpillar requested that Northeast subordinate its security interest with respect to the purchased (and, now, to-be-financed) equipment. Northeast demurred.

On July 17, 2007, Caterpillar filed a UCC-1 Financing Statement with the Maine Secretary of State, disclosing its security interests in the purchased machines. On July 30, 2007, Flagg executed a security agreement granting those security interests to Caterpillar, and Flagg provided Caterpillar a promissory note in the amount of $491,596.41. Caterpillar wired Southworth-Milton the purchase price it was owed and paid off the encumbrances on the equipment Flagg had traded-in.

On September 20, 2007, Southworth-Milton deposited three checks from Flagg, all dated July 18, 2007, totaling $44,017.17. The checks did not clear. Flagg stopped payment and filed

---

[5]      Among other things, in early July Caterpillar relented on its demand for certain cross-collateralization and cross-default terms.

4

its bankruptcy petition on September 21, 2007.

### III.  Discussion[6]

Article Nine of Maine's Uniform Commercial Code (UCC) governs here.[7]  The general

rule under Article Nine is that earlier-perfected security interests are entitled to priority over

later-perfected security interests.[8]

Northeast acknowledges that Caterpillar holds a valid, perfected security interest in the

equipment Southworth-Milton sold Flagg.  It attached on July 30, 2007, when Caterpillar

transferred funds to Southworth-Milton,[9] and it was perfected the same date, as the appropriate

financing statement had previously been filed.[10]  Northeast's perfection predated Caterpillar's by

months.  While normally this would give Northeast's security interest priority over Caterpillar's,

---

[6]      Resolution of this dispute is governed by state law, and the law of Maine on this
point is not highly developed.  I have considered certifying the determinant issue to the Supreme
Judicial Court of Maine, sitting as the Law Court.  See 4 M.R.S.A. § 57; M. R. App. P. 25.
However, the parties have not sought certification and, to my eye, the issue can be resolved on a
straightforward reading of the implicated state statutes.  See Custom Built Homes of Maine v.
Hampton Mgmt. Corp., 689 F.Supp. 28, 31 n.6 (D.Me. 1988).  To the extent necessary, I will
consider "analogous decisions, considered dicta, scholarly works, and any other reliable data
tending convincingly to show how the highest court in the state would decide the issue at hand."
Michelin Tires (Canada) Ltd. v. First Nat. Bank of Boston, 666 F.2d 673 (1st Cir. 1981).

[7]      See 11 M.R.S.A. § 9-1301(1)("the following rules determine the law governing
perfection, effect of perfection or nonperfection and the priority of a security interest in
collateral....(1)...while a debtor is located in a jurisdiction, the local law of that jurisdiction
governs perfection, the effect of perfection or nonperfection and the priority of a security interest
in collateral").

[8]      See, e.g., 11 M.R.S.A. § 9-1322(1)(a).

[9]      This was the first date on which all three requisites of perfection existed: (1) value
was given by Caterpillar, (2) Flagg had rights in the collateral or the power to transfer rights in
the collateral to Caterpillar, and (3) Flagg had authenticated a security agreement that provided a
description of the collateral.  See 11 M.R.S.A. § 9-1203(2)(a)-(c).

[10]      See 11 M.R.S.A. § 9-1308(1).

the UCC makes an exception to the first-to-file rule for pmsi's:

> a perfected purchase-money security interest in goods other than inventory or livestock has priority over a conflicting security interest in the same goods...if the purchase-money security interest is perfected when the debtors receives possession of the collateral or:
> (a) In the case of goods covered by Title 29-A, chapter 7, within 30 days thereafter; or
> (b) In all other cases, within 20 days thereafter.[11]

Maine's  UCC provides for a pmsi in goods "[t]o the extent that the goods are purchase-money collateral with respect to that security-interest."[12]  The burden rests with the party seeking pmsi status (here Caterpillar) to prove the validity of its pmsi.[13]

Northeast challenges Caterpillar's ability to demonstrate the purchase money character of its security interest.  In its view, although Southworth-Milton's delivery of the equipment by April 11, 2007, did not transfer title in the equipment to Flagg, its subsequent issuance of the invoice on June 11, 2007, did do so.  Although the invoice contained a boilerplate term by which Southworth-Milton purported to retain title until it was fully paid, the UCC is clear that the term

---

[11]      11 M.R.S.A. § 9-1324(1).  Title 29-A, chapter 7, is the Maine Motor Vehicle Act, which is not applicable here, thus the twenty-day period governs.

[12]      11 M.R.S.A. § 9-1103(2)(a).

> (a) "Purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and
> (b) "Purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

11 M.R.S.A. § 9-1103(1).  Official Comment 3 elucidates:

> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation.  Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

11 M.R.S.A. § 9-1103, Comment 3.

[13]      11 M.R.S.A. § 9-1103(7).

merely effected Southworth-Milton's reservation to itself of a security interest.[14]  Southworth-

Milton's own bookkeeping supports the conclusion that it extended credit to Flagg in order to

effect the sale,[15] and the deposition testimony of Southworth-Milton's representative bolsters my

finding to that effect.[16]

The long and the short of it is this: Southworth-Milton sold the equipment to Flagg on

June 11, 2007, hoping (perhaps even expecting) that Caterpillar (or, perhaps some other entity)

would eventually shoulder Flagg's financing.  In the course, Southworth-Milton, via its

"reservation of title" boilerplate retained a lien to secure payment (viz., a pmsi).  But

Southworth-Milton failed to perfect that security interest within twenty days of Flagg's acquiring

all rights in the equipment, which was required to give it the statutory leg-up over Northeast's

pre-existing blanket lien.  After twenty days ran from June 11, the lien Southworth-Milton

---

[14]    See 11 M.R.S.A. § 2-401(1)("Any retention or reservation by the seller of the title
(property) in goods shipped or delivered to the buyer *is limited in effect to a reservation of a
security interest*.  Subject to these provisions and to the provisions of the Article on secured
transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on
any conditions explicitly agreed to by the parties")(footnote omitted)(emphasis supplied).  And
see In re Gull Air, Inc., 73 B.R. 820, 824 (Bankr.D.Mass. 1987)(discussing the interplay between
§ 2-401(1) and (2)).

[15]    As of June 11, 2007, Southworth-Milton had removed the four pieces of
equipment previously delivered to Flagg from its inventory, added the three pieces of trade-in
equipment to its inventory (then shortly thereafter re-sold one of those pieces), and added a
payable from Flagg for the cost of the four pieces of equipment sold less the value of the three
pieces of equipment traded in.

[16]    Southworth-Milton's representative testified in his deposition as follows:

Q....Why don't you explain to me what that means from your point of view, [net cash
upon receipt of invoice].  A.  From my point of view it means that once we invoice this
machine, we're owed money from it.  Whether it's from the customer or his bank or
[Caterpillar], we're owed.  Q.  Okay.  A.  So from our perspective, it's a cash deal.  Q.
Okay.  And once that invoice issues, someone owes you money?  A.  That's correct.

His later affidavit re-characterizes the transaction, but not convincingly.

retained lost its capacity to trump Northeast's.  At that point, Northeast's pre-existing security

interest was no longer vulnerable to upset with respect to Flagg's equipment purchase financing.

The timing and structure of the sale clearly shows that Southworth-Milton initially financed

Flagg's purchase, and that it consummated the sale while Caterpillar financing had not advanced

beyond the pupal stage.[17]

Caterpillar has assembled an array of authorities to buttress its position, but they cannot

be bulldozed into a shape that provides meaningful support.[18]  The essence of Caterpillar's

---

[17]     This is not to say that Caterpillar could not have obtained priority in a more
carefully constructed transaction.  Had Southworth-Milton timely perfected its pmsi, it could
have assigned it to Caterpillar, preserving its ascendant character.  See, e.g., Allis-Chalmers
Corp. v. Hadley, 413 A.2d 934, 935 (Me. 1980)(assignee asserting rights under pmsi).

[18]     See Equipment Finance Group, Inc. v. Traverse Computer Brokers, 973 F2d. 345,
346 (4th Cir. 1992)("delivery terms specified that the workstations would not be installed or
used until [the debtor] paid for them"); In re Ultra Precision Indus., Inc., 503 F.2d 414, 417 (9th
Cir. 1974)(debtor was given a test-period, and outside financing was a condition precedent to the
ultimate purchase); Fleet Capital Corp. v. Sutherland Presses (In re Enter. Indus., Inc.), 259 B.R.
163, 169 (Bankr.N.D.Cal. 2001)("due to the structure of the transaction, [the debtor] acquired
different 'rights' in the press at each successive stage"); Hunter v. McHenry (In re McHenry), 71
B.R. 60, 64 (Bankr.N.D.Ohio 1987)("transaction involved all three parties....[V]alue extended by
[the non-seller financer] was intended to, and did in fact, enable the Debtor to acquire the car,
regardless of whether or not she already had possession"); U.S. v. Hooks (In re Hooks), 40 B.R.
715, 720 (Bankr.M.D.Ga. 1984)(that the debtor took possession of cows to inspect and milk
them to decide if he wanted to purchase them was uncontradicted, and title did not pass until the
loan closed); In re Brooks, 1980 Bankr. LEXIS 5116 (Bankr.D.Me. 1980)("the security
interest...was not given for present consideration; it was clearly given as a security for the credit
union's pre-existing claim"); Citizens Bank of Americus v. Fed. Fin. Servs., Inc., 509 S.E.2d
339, 342 (Ga.Ct.App. 1998)(transaction was subject to debtor's obtaining insurance in favor of
seller and financer of equipment to be purchased); Corim, Inc. v. Belvin, 414 S.E.2d 491, 492
(Ga.Ct.App. 1991)(pre- and post-auction steps were part of one loan agreement where the
amount to be loaned could only be determined at the auction), rev'd on other grounds sub nom,
Crossroads Bank of Georgia v. Corim, Inc., 418 S.E.2d 601 (Ga. 1992); De Kalb Bank v. Purdy,
562 N.E.2d 1223, 1228 (Ill.App.2d 1990)(explicit, non-boilerplate, agreement reserved title in
the seller until payment was made); NBD-Sandusky Bank v. Ritter, 471 N.W.2d 340, 365-66
(Mich. 1991)(non-seller financer perfected its interest within the relevant period following sale);
General Elec. Capital Commer. Auto. Fin. v. Spartan Motors, Ltd., 675 N.Y.S.2d 626, 632
(N.Y.A.D. 2 Dept. 1998)(non-seller financer had committed to financing debtor's purchase and
seller did not argue that the debtor could have afforded the purchase otherwise); Thet Mah and

contention is that it should be considered the purchase money lender, notwithstanding the June

11, 2007, sale, because its funding was something that Flagg and Southworth-Milton had in mind

throughout the course of the sale transaction.  But providing Caterpillar with pmsi priority based

on the parties' subjective expectations would do violence to Article Nine's carefully crafted

scheme establishing how consensual liens are created, perfected, and prioritized based on

objectively cognizable criteria.

### IV.  Conclusion

I conclude that Northeast's pre-existing security interest has priority over Caterpillar's

security interest in the four pieces of equipment Flagg purchased from Southworth-Milton.  A

separate order consistent with this opinion will enter forthwith.


January 23, 2009
_____
Date

/s/ James B. Haines, Jr.
_____
James B. Haines, Jr.
U.S. Bankruptcy Judge

---

Associate, Inc. v. First Bank of North Dakota (NA), 336 N.W.2d 134, 138 (N.D.
1983)(commitment to finance purchase of equipment was obtained prior to the transaction and
relied upon by the parties thereto).